In the Matter of the Estate of JOSEPH R. SKIDMORE, Deceased.

Surrogate's Court, New York County, July 13, 1933.

*White & Case*, for the petitioner, Bankers Trust Company.

*DeWitt, Lockman & DeWitt*, for Gurnee Hinman Barrett, as sole surviving executor, etc., of Lucy S. Scribner, a deceased cotrustee.

*Gillespie & O'Connor*, for the contestant William S. Barrett, 3d.

*Howard C. Kelly*, special guardian for Joseph Russell Barrett, Jr., and Eleanor Joyce Barrett.

*John J. O'Connor*, special guardian for infants Gurnee Hinman Barrett, Jr., and Mary Barrett.

*Medina & Sherpick* [*Harold R. Medina, Stephen J. McGarrigle, Sylvester L. H. Ward* and *Rufus C. Van Aken* of counsel], for Gurnee Hinman Barrett, individually, and Rosamond Kimball, as executrix, etc., of Alfred R. Kimball, a deceased cotrustee.

*Donovan & Raichle* [*George M. Billings* of counsel], for the contestant William S. Barrett, Jr.

*Battle, Levy, Van Tine & Fowler* [*Addison A. Van Tine* of counsel], for Joseph Russell Barrett, Harold Birdsall Barrett, Bertram Jackson Barrett and Lucy Skidmore Barrett.

DELEHANTY, S. Testator died in 1882, leaving a widow, a daughter, a brother, two sisters and the issue of a living sister surviving him. His will was duly probated. The executors never judicially settled their accounts. They eventually turned over to trustees named in the will certain funds as the corpus of two trust funds provided for therein. The trustees rendered an interim account covering the period of their administration of the trusts from 1886 to 1920. On that accounting all parties then in being and interested in the fund were cited. A decree was entered in 1921 settling that account. The life estate having since terminated, the now pending accounting was instituted by the trustees to determine the proper distribution of the principal of the trust. On this accounting new parties have been cited who were not in being at the date of the first accounting and questions have been raised by them respecting the duty of the executors to account and thereby to fix the capital of the trusts. A further question concerns the effectiveness of the purported exercise of a power to appoint the recipients of the trust principal. This question occupied the attention of referee and counsel in major degree and will be first discussed.

Deceased by his will provided:

" *Secondly*. And I give * * * the rest * * * of my estate * * * as follows:

" 3. One other equal undivided fourth part to my Executors, or those of them who may qualify and the survivors and survivor of them, in trust to receive the rents, issues and profits, interest and income thereof, and to apply the same to the use of my said wife, during her natural life, and after the decease of my said wife in trust to receive the rents, issues and profits, interest and income thereof, and apply the same to the use of my said daughter, during her natural life, and upon the death of the survivor of my said wife and daughter, to convey and transfer the same to my said daughter's lawful issue then living, *per stirpes* and not *per capita;* and in case there shall be at the death of such survivor no such issue living, to convey and transfer the same to such relations of mine of the full blood, as my said daughter may by her last Will and Testament designate and appoint; and for want of such designation and appointment to convey and transfer the same to my brother and sisters then living, and the issue then living of any deceased brother or sister *per stirpes* and not *per capita,* and

" 4. The remaining equal undivided fourth part to my Executors, or those of them who may qualify, and the survivors and survivor of them in trust to receive the rents, issues and profits, interest and income thereof, and apply the same to the use of my said daughter

during her natural life and upon her death to convey and transfer the same to the lawful issue of my said daughter then living, *per stirpes* and not *per capita*, but if there be no such issue then living, then upon the death of my said daughter in case my wife be living, to receive the rents, issues and profits, interest and income thereof, and apply the same to the use of my said wife during her natural life, and upon the death of my said wife, or upon the death of my said daughter, if she shall have outlived my said wife, to convey and transfer the same to such relations of mine, of the full blood, as my said daughter by her last Will and Testament may designate and appoint, and for want of such designation and appointment, to convey and transfer the same to my brother and sisters then living and the issue of any deceased brother or sister *per stirpes* and not *per capita*."

By will duly admitted to probate the daughter of deceased undertook to exercise the power so granted to her. Her will says:

" *Eleventh*. As to the two-fourths of the residuary estate of my father Joseph R. Skidmore deceased over which I have power of appointment and carrying out my father's wish I give and bequeath the same as follows that is to say

" 1. Unto Gurnee Hinman Barrett the son of my cousin William S. Barnett the sum of One hundred thousand dollars In the event the said Gurnee Hinman Barrett shall die before me then I give and bequeath the said sum of One hundred thousand dollars unto his issue surviving me *per stirpes* and not *per capita*.

" 2. Unto William Skidmore Barrett, Jr., son of my cousin William S. Barrett the sum of Ten thousand dollars In the event the said William Skidmore Barrett, Jr., shall die before me then I give and bequeath the said sum of Ten thousand dollars unto his issue surviving me *per stirpes* and not *per capita*.

" 3. All the rest residue and remainder of the said two-fourths parts of the said residuary estate of my father Joseph R. Skidmore deceased over which I have power of appointment including any of the legacies given in the foregoing subdivisions 1 and 2 of this eleventh clause which may lapse I give and bequeath unto the seven grandchildren of my cousin William S. Barrett that is to say Gurnee Hinman Barrett Jr. and Mary Barrett children of Gurnee Hinman Barrett William Skidmore Barrett 3rd son of William Skidmore Barrett Jr. and Joseph Russell Barrett Harold Birdsall Barrett Bertram Jackson Barrett and Lucy Skidmore Barrett children of J. Russell Barrett deceased share and share alike and unto the survivors or survivor of them except as hereinafter provided and further provided however that if either of the said grandchildren of my said cousin William S. Barrett shall die before me leaving issue

surviving me then I give and bequeath the share the one so dying would have taken if living unto his or her issue *per stirpes* and not *per capita.*"

The brother and sisters of testator having predeceased the donee of the power (but issue of a sister having survived the donee), the problem now is presented whether the distribution directed by her appointment is valid in whole or in part or whether the class of permissible appointees has failed.

The referee has held that the power was validly exercised in so far as selection of appointees is concerned but that no right resided in the donee to discriminate as to benefit conferred on her appointees and has held that each appointee takes an equal portion of the fund. The referee reached this conclusion because of the language of sections 98 and 99 of part 2, chap. 1, tit. 2, art 3. of the Revised Statutes which were in effect at testator's death. These sections provided:

" Sec. 98. Where a disposition under a power is directed to be made to, or among or between several persons, without any specification of the share or sum to be allotted to each, all the persons designated, shall be entitled to an equal proportion.

" Sec. 99. But when the terms of the power import that the estate or fund is to be distributed between the persons so designated, in such manner or proportions as the trustee of the power may think proper, the trustee may allot the whole to any one or more of such persons, in exclusion of the others."

The industry of counsel evidenced in their briefs and their zeal in argument and a due respect for the views of the referee require examination of the entire basis upon which the referee reached the result stated, even though the decision of the court might be made without reference to all the questions argued. On the argument some of counsel asserted that the words " all the persons designated " found in section 98 and the words " the persons so designated " found in section 99 mean the persons designated as actual appointees by the donee. This view is erroneous. The statutory reference is solely to the donor's designation of the " objects " of the power. As there used, it is not descriptive of the persons to whom the property is eventually appointed. The statutory command of equality of benefit under section 98 is effective only when the donor has designated the persons entitled of right to receive benefit if the power is exercised, while leaving no authority to discriminate as to amount of benefit. That authority to discriminate as to quantum may be explicit or implicit. Controversy whether the right existed to discriminate as to object or quantum or both had, in the mass of cases decided (chiefly in English tribunals) before our statutes were revised in 1829, given rise to so many distinctions and refinements

as to make the law of powers, in the opinion of the revisers, " the most intricate labyrinth in all our jurisprudence."

It was to destroy that labyrinth and to make the law understood of all men that the revisers drafted sections 98 and 99. The evil at which they aimed was clear to them. They said of the new sections: " They are intended to prevent the interference of equity, in correcting what are called *illusory* appointments — a jurisdiction very questionable in itself, and of which the limits are still uncertain. * * *

" It is believed by the Revisers that all the difficulties on this subject are avoided, and the intent of the party creating the power fulfilled, by making the discretion of the trustee extend to a selection of the objects, as well as to the amount of the shares; in other words, by giving him *directly* the power which *indirectly* he may now exercise." (Italics in original text.)

Their notes show that the evil existed in respect only of so-called " non-exclusive " powers. From these only had sprung the multitude of distinctions and refinements which plagued the bench and bar. Their notes were published in 1836 as an appendix to the Revised Statutes. In 1830 the English Parliament had by statute corrected in some degree in England the conditions adverted to by the revisers. The revisers no doubt were familiar with the act known as 11 Geo. IV & 1 Wm. IV, chapter 46. It seems clear, therefore, that in their notes is found the rule of interpretation of the then new sections, to wit, that they have application only to so-called " non-exclusive " powers in respect of which only could questions arise such as those which had invoked legislative action.

The power contained in the will here under consideration is an exclusive power. (1 Tiffany Real Prop. [2d ed. 1920] §§ 320, 328; see, also, discussion in *Barrett's Executor* v. *Barrett*, 166 Ky. 411; 179 S. W. 396.) The terms " exclusive " and " non-exclusive " are still appropriate descriptions of the limits of authority granted by a power. The revision did not abolish the accepted channels of thought nor the modes of expression used in relation to powers.

In the fourth edition of his Commentaries on American Law, published in 1840, just after the revision, Chancellor KENT (Vol. 4, pp. 342, 343) said: " Where the distribution is left to discretion without any prescribed rule, as to *such* of the children as the trustees shall think proper, he may appoint to one only. But if the words be *amongst* the children as he should think proper, each must have a share and the doctrine of illusory appointment applies. The distribution under the power of appointment, by the New York statute, must be equal in the one case; and, in the other the trustee

has an entire discretion in the selection of the objects, as well as to the amount of shares to be distributed." (Italics in original text.)

That this declaration of Chancellor KENT is a statement of the commonly accepted understanding of the authority granted by an exclusive power is shown by the cases. In *Allder* v. *Jones* (98 Md. 101) a will gave to a wife the life use of property with power to will the principal to testator's " children as she thinks proper at her death." By her will the wife gave all the personalty subject to the power to two of her children in equal shares. All the realty so subject she gave to the same two children but charged such realty with the sum of $1,000 payable in four installments to a third child. The points of counsel printed in the report show that the question was completely argued. The court deemed the power an exclusive one and held the disposition valid. In New York the language quoted would probably be held non-exclusive (*Matter of Steiner*, 134 App. Div. 162), but nevertheless the commentary of the Maryland court is illustrative of judicial concept of the authority granted by an exclusive power. In *Rhett* v. *Mason* (59 Va. [18 Grattan] 541, at pp. 566–568), the court construed a power somewhat wider in terms than that here for consideration and detailed reasons for broad construction of an exclusive power which are equally applicable to this case. In *Cochran* v. *Elwell* (46 N. J. Eq. 333) the chancellor held valid an appointment by a wife under a power contained in her husband's will to dispose of his property " to any of her children or grandchildren that she may think proper to bequeath the same to." In the cited case the wife had appointed $200 each to two of her children and then had appointed the balance one-third each to the same two children and the remaining one-third to certain grandchildren. The chancellor said: " The distribution under the power is to be to ' any ' of the wife's children or grandchildren ' that she may think proper to bequeath the same to.' By force of the word ' any ' (which indicates that which is indefinite), it was left entirely to her discretion how many or whom of the persons within the designated class should be distributees."

The chancellor made no comment on the quantum of property appointed. He apparently took for granted that authority inhered in the power to make this discrimination.

The case of *White* v. *Wilson* (1 Drewry, 298) illustrates both types of powers. A donor, Lord Chedworth, directed that upon the death of a donee for whom he had established a trust the principal was to be paid " to such person as she * * * should direct and appoint." Pursuant to this power, the donee appointed to each of two sons securities having the par value of £1,000 and to each of two daughters securities having the par value of £5,000. She then

gave the residue to her husband for life, making specific gifts of parts of the residue effective upon the death of the husband and providing that any remainder after such specific gifts might be appointed by her husband to three named children of hers " in such manner as her said husband * * * should in and by his last will direct and appoint." In pursuance of the delegated power the husband purported to give £500 to one of the named children, nothing to the second and the balance of the fund to the third. The case, it will be noted, involves an exclusive power to the original donee and the exercise of such power to confer unequal benefits upon her beneficiaries. This distribution was held valid. On the other hand, the delegated power was a non-exclusive power. By its terms it required distribution to each of three children. Because the directed distribution was to two only the attempted exercise of the delegated power was held invalid and the named objects were held entitled to the residue in equal shares.

It is not sound to say in the case here for decision that the power gives the donee a right of exclusion only as to " objects " and contains no words authorizing discrimination as to quantum. The use of the statutory words " in such manner or proportions " is not a prerequisite to disparate treatment. If a right exists to exclude from benefit entirely there is necessarily included the right to fix the amount of benefit conferred, if any be conferred in fact. In other words, the greater power includes the lesser. While cases on the point seem to be few in respect of personalty, there is ample authority to this effect in respect of appointments of interests in realty. (*Lawrence's Estate,* 136 Penn. St. 354, at p. 367; *Mays* v. *Beech,* 114 Tenn. 544; 4 Am. & Eng. Ann. Cas. 1189, 1191; *Butler* v. *Huestis,* 68 Ill. 594.)

Authority in this State on the precise point in issue is not lacking. In *Maynard* v. *Farmers Loan & Trust Co.* (119 Misc. 503) the Supreme Court (BIJUR, J.) held valid a discrimination in benefit under an appointment similar in terms to that contained in the will here under consideration. In the cited case the printed appeal record shows that an agreement had been made between a husband and wife whereunder a deposit of $700,000 was made with trustees who undertook to pay the income thereon to the wife for life, and who further undertook " upon the death of said Blanche A. Thompson, to turn over the then principal of said trust, to wit: the remainder-over of said trust fund to such person, persons, institution, institutions, corporation or corporations, authorized by law to receive the same, and as said Blanche A. Thompson shall in a last will and testament by her duly executed and thereafter duly probated designate and appoint to receive the same."

By her will Blanche A. Thompson appointed a trust fund of $250,000 for her mother with remainder to be disposed of as part of her residuary; a trust fund of $150,000 for her father with remainder to named beneficiaries; two trust funds each of $2,000 to named individuals who were to receive the principal at specified ages; two trust funds each of $15,000 to named individuals with remainder to be disposed of as part of her residuary; and she finally appointed the balance of the fund to her residuary legatee, a corporation which she directed to be organized for the purpose of taking all her residuary and using it in a philanthropic enterprise.

In an action by the trustees to settle their accounts the husband interposed an answer and claimed title to the entire fund, asserting that there had been no valid appointment. The corporation organized pursuant to the residuary clause appeared and in its answer asserted the valid execution of the power of appointment. It is to be noted that in respect of this corporation it succeeded to the remainder of the trust funds aggregating $280,000 established by Blanche A. Thompson for her mother and two other beneficiaries. There was necessarily involved, therefore, a determination whether the scheme of appointment to them was valid. In its conclusions of law the court specifically held each appointment to be a valid appointment, and when passing upon proposed findings and conclusions refused requested findings to the contrary. While the major question argued and briefed was the question whether the non-existence of the corporation at the date of death of the donee made her testamentary scheme invalid because such non-existence suspended the absolute ownership of property in violation of section 11 of the Personal Property Law, the court affirmatively passed upon the validity of the appointment and a decision thereon was necessarily involved in a determination of the legal rights of the corporation. The case went to the Appellate Division (208 App. Div. 112) and was there modified in part but not on the point here discussed. The dissenting opinion there written evidences that that court gave detailed consideration to the instrument creating the power and to the will whereunder it was exercised. The case reached the Court of Appeals (238 N. Y. 592), which affirmed the Appellate Division " on the ground that power of appointment was validly executed."

The will of Blanche A. Thompson was again under scrutiny in this court (126 Misc. 99). Mr. Surrogate FOLEY passed upon the clause which created the trust funds and upon the residuary clause. An appeal was taken from his determination of the questions before him and a modification made in respect of matters not here involved

(218 App. Div. 130). This issue went to the Court of Appeals (245 N. Y. 565), which again had before it the validity of the appointment and again affirmed such validity.

In *Matter of Terwilligar* (135 Misc. 170) Mr. Surrogate WINGATE had under consideration a will which provided a trust for life in favor of a wife with direction upon her death to pay over the principal " to such person or persons as she " might direct by her will. In exercising the power conferred, the wife appointed three general legacies of $10,000 each to named beneficiaries and then divided the remainder into thirty-five equal shares and erected trusts therefrom for the benefit of other named beneficiaries. The printed record on appeal to the Appellate Division shows the size of the estate and establishes that there was inequality of benefit conferred in the exercise of the power. The surrogate held invalid certain aspects of the appointment only because they violated the statutes against perpetuities. He held the appointment valid, however, in all other respects. His opinion was adopted as a correct statement of law (230 App. Div. 763).

To none of the score of judges who considered these powers and the appointments under them, did there occur any doubt of the validity of the execution of the powers for the reason stated by the referee. As quoted, the text of the power in each cited case authorized the appointment of " *such* person," etc., as the donee might select, and said nothing about " proportions " or shares. In the case here for decision the power is to appoint " *such* relations," etc., as the donee might choose, again without mentioning " proportions " or shares. The *Thompson* and *Terwilligar Cases (supra),* therefore, are decisive that in New York the exercise of an exclusive power, such as is here under consideration, is not governed by the statutory rule of equality of benefit stated in section 98 of the Revised Statutes (now section 158 of the Real Property Law); that the application by the referee of such statutory rule of equality of benefit was erroneous; and that the appointment made by the daughter of testator is valid in all respects if the appointees selected by her are within the class of " objects " named by testator as possible appointees.

Testator granted to his daughter power to appoint his property to " relations of mine of the full blood." There is ample dictionary definition of the terms " full blood," " whole blood " and " entire blood." So, too, rights in land under a system of feudal tenure with the corresponding duty to render feudal service caused in English law the display of much learning on the subject of " blood." Bracton, Littleton, Coke and others are quoted by William Blackstone, Esq., to support the views expressed by him in his treatise on the

Law of Descents in Fee Simple (published in 1760) wherein he said (p. 46): " A kinsman of the whole blood is he that is derived, not only from the same ancestor, but from the same couple of ancestors. For, as every man's own blood is compounded of the bloods of his respective ancestors, he only is properly of the whole or entire blood with another, who hath (so far as the distance of degrees will permit) all the same ingredients in the composition of his blood that the other hath."

The Commission on the Law of Real Property apponted by George IV to revise the Real Property Law of England reported in 1829 to Parliament and said (Vol. 1, p. 10): " When there is no lineal descendant, the estate goes to the eldest or only brother of the whole blood, that is, who was born of the same father and mother as the deceased proprietor." Dictionaries and commentators agree that in strict speech only persons who are issue of the same parents can be of the " full " or " whole " or " entire " blood in their relations to each other. The early cases dealing with the doctrine commonly referred to as " *possessio fratris* " illustrate the strict application of the rules of descent governed by blood relationship. Under this doctrine if an eldest son actually entered into possession, his title (failing issue) would go (despite the preference of males over females) to his sister of the full or whole blood rather than to a brother born of the same father but of a different mother; but if the eldest son died without taking possession, the title, on the death of the father, would descend to the son by the second wife to the exclusion of the sister of the whole blood of the first expectant heir. (Further discussion of the question of blood relationships may be found in Chitty on Descents [London, 1825], p. 101; Chase's Blackstone [3d ed.], p. 396; 4 Kent's Commentaries on American Law [4th ed.], p. 405; and in the opinion of Mr. Justice STORY in *Gardner* v. *Collins*, 27 U. S. 58.) The Legislature of this State in an early enactment used the terms " whole blood " and " half blood " in the same sense as did Blackstone (Vol. 1, Revision of 1813, Ninth Session, chap. XII, p. 53); that is, as referring to brothers and sisters only. By statute only, did the half blood acquire equal right with the whole. It is notable that in this act (passed in 1786) the half blood was still excluded if his blood stream did not include the blood of the ancestor through whom the inheritance came. There are, of course, various statutory uses of the words " whole blood " and " half blood " which are not limited to brothers and sisters, but as so used are apt to define the classes of persons contemplated by these enactments. Such uses do not effect abolition of the strict legal meaning of the words.

In his treatise referred to (p. 9) Blackstone demonstrates to his

own satisfaction that in the twentieth degree of kinship any individual would have 1,048,576 relations. Even though the learned commentator forgot the inevitable duplications or intermingling of relationships in such a family tree and though in consequence his figures cannot be accepted as valid, there is no doubt that some trace of the blood of common ancestors might be found in a multitude of men if inquiry were pursued sufficiently far. The referee has found the appointees are relations of testator of the full blood as he meant the words. Concededly the referee has attributed to testator's words a meaning which is not exact. This result was reached by the referee after considering testator's age and the ages of the brother and sisters who alone strictly met the description in the phrase. The referee concluded from these extrinsic circumstances that testator intended to include as " objects " all his blood relatives. In effect the referee has excised from the seven-word phrase the words " of the full blood " and has given to it the same meaning as if it contained only the words " relations of mine." Excision is a desperate remedy. (*Matter of Buechner*, 226 N. Y. 440, 443.) If testator did not by this phrase intend to designate exclusively his brother and sisters who alone had blood streams conforming to his, it must follow that his donee had authority to appoint his property to any person in whose veins ran any fraction, no matter how small, of blood similar to his.

No doubt testator could have used the words " brother and sisters " instead of the phrase under consideration. Does it follow that because he did not he is held to have excluded them? Nobody so argues and no argument so made would be tenable. If the conclusion reached by the referee is tenable it must be reached by concluding that while the brother and sisters of testator lived they were included in the " objects " of the power (though not the exclusive " objects ") and, hence, that the donee had the power to appoint grandnephews (having one-eighth of testator's blood) or great grandnephews (having one-sixteenth of testator's blood) to the exclusion of his living brother and sisters of the full blood. The referee has so interpreted the phrase because at the date of the will testator was advanced in years as were also his brother and sisters and because in the course of nature his daughter was likely to outlive them as in fact she did. The text of the will does not permit the conclusion that testator assumed necessarily that his daughter would survive his brother and sisters. The will expressly negatives this idea for by its terms it provides for the contingency of non-exercise of the power and directs the transfer of his property in such event to his brother and sisters if they survived his daughter. Nothing could demonstrate more clearly that testator considered

as at least a possible contingency the death of his daughter before that of her paternal aunts and uncle. His testamentary scheme is clear and consistent. He first took care of his wife and daughter for their lives. He next provided that his property would go to his direct descendants, to wit, to his daughter's issue if any there were. These were *his* directions not subject to change by any term of the power. He next provided the power of disposition which is under discussion. Next he provided for the disposal of his property if no direct descendant took it and if it were not appointed as he authorized. In that event *he* gave it to his *brother and sisters then living* (*i. e.,* living after both wife and daughter were dead) and to the issue of any deceased brother or sister *per stirpes.*

In the search for a testator's intention courts may consider extrinsic circumstances to resolve ambiguities but they may not rewrite a will. (*Matter of Durand,* 250 N. Y. 45.) The primary source of information as to a testator's meaning is the will itself. If the words are clear and as used have a definite meaning, courts are not warranted in exploring the probability that something other than that definite meaning was in the mind of the testator. This rule is clearly stated in *Dwight* v. *Fancher* (245 N. Y. 71) where the Court of Appeals said: " Evidence of extrinsic circumstances may sometimes assist the court in the construction of language which a testator has used to express his testamentary intention; but here the language of the will, even when read in the light of extrinsic circumstances, admits of but one construction. Parol evidence is not admissible to show that the testatrix did not mean what she has said in words, though these words may have been chosen by the attorney who drafted the will rather than by the testatrix. (*Reynolds* v. *Robinson,* 82 N Y 103.)" So, too, the Court of Appeals quotes with approval (*Matter of Silsby,* 229 N. Y. 396, 402) a declaration of Chief Judge POUND in a *nisi prius* decision by him: " In construing a will it has been repeatedly held that the object of the courts is to ascertain, *not the intention simply,* but the *expressed intention,* of the testator, *i. e,* the intention which the will itself, either expressly or by implication, declares. In other words, it is the duty of the court to ascertain the intention of the testator *from the words he has used,* and to ascertain and give effect to the legal consequences of that intention when ascertained." (Italics not in original text.)

Since we have here words which import an accepted meaning and persons precisely meeting the description thereof, we may not go further. We must assume testator meant what he said. It follows that none of the " objects " named by testator survived the donee, that this fact rendered null the power granted by testator, and that no property of testator passed under the attempted exercise of the

power. As a result, the property passed by virtue of the directions in his own will to the issue *per stirpes* of his deceased brother and sisters. This result conforms to the testamentary scheme of testator to keep his property at all times within the possession of those closest to him. Any other determination would permit a distribution repugnant to the plain intent disclosed by the words of the will. In the respects stated, the exceptions to the findings of the referee are sustained.

There is no substance to the exceptions to the findings of the referee made on the score that the former account of the trustee reported as on hand a capital fund expressed in money value at a sum in excess of that now reported. The securities shown to be on hand at the opening of this accounting period are the same as those shown in the schedules of the former account to have been on hand at the close of the first accounting period. All trustees are chargeable with the fund as it actually existed and only with that. The exceptions in respect of this branch of the referee's findings are overruled.

The decree settling the trustees' account for the period from 1886 to 1920 is final as to matters embraced therein (*Matter of Barrett*, 124 Misc. 699) and is a bar to any claim of surcharge of the old trustees because of shrinkage in value of securities prior to that decree. The exceptions in respect of this branch of the referee's findings are overruled.

The decree entered in 1921 settling the former account of the trustees is binding on the parties to this proceeding who were not in being at the date of such account. (*Kent* v. *Church of St. Michael*, 135 N. Y. 10; *Matter of Schliemann*, 140 Misc. 230, and cases there cited.) The exceptions in respect of this branch of the referee's findings are overruled.

No party to this proceeding has suggested in any affirmative way that the executors did not turn over to themselves as trustees all property properly constituting the capital of the trusts. In view of the lapse of nearly fifty years since the trustees commenced to function as such, concrete and specific proof of the existence of unaccounted for assets would alone suffice to invoke action by the court. No fraud being claimed, the right to an account is barred by the decree of 1921. (*Spallholz* v. *Sheldon*, 216 N. Y. 205.) The exceptions in respect of this branch of the referee's findings are overruled.

Proceed accordingly.